

305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255
www.clayro.com

June 22, 2012

Hon. Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York 11201
BY HAND

Re: <u>United States v. Gary Foster</u>
11 Crim. 601 (ENV)

Dear Judge Vitaliano:

    We are the attorneys for Gary Foster, the above named defendant. We submit this letter on Mr. Foster's behalf, in anticipation of sentencing, currently scheduled for June 29, 2012.

Procedural History

    On June 23, 2011, the United States Attorney's Office for the Eastern District of New York filed a complaint charging Gary Foster with Bank Fraud in connection with the theft of funds from Citibank, his longtime employer.

    In or around June 24, 2011, F.B.I. agents went to Mr. Foster's home to arrest him, but were unable to locate him. Instead, they informed Mr. Foster's family that they were looking for him and asked that they tell Mr. Foster to contact them. Mr. Foster, who was on an airplane en route to Thailand, received text messages from his family informing him that F.B.I. agents were looking for him and provided him with contact information for one of the agents. As soon as he landed in Thailand and was able to do so, Mr. Foster promptly telephoned the agent, who informed him that an arrest warrant had been issued for him. Mr. Foster immediately made arrangements to return to the United States. He booked a flight so as to return to the United States as quickly as possible and sent a copy of his airline reservations to the F.B.I. agent. Only then did he contact counsel to represent him in connection with this matter.

    Upon landing in the United States on June 26, Mr. Foster was met at the airline gate by law enforcement and was placed under arrest. He was completely cooperative during the arrest process. He appeared before United States Magistrate Judge Reyes on June 27, 2011 and was released on bail.

Hon. Eric Vitaliano
June 22, 2012

Within weeks of his arrest, Mr. Foster authorized counsel to provide the government with a thumb drive containing all of Mr. Foster's banking and credit card information, saving the government considerable time and effort in obtaining this information. At the time of the filing of the criminal complaint, the government seized a number of properties and automobiles which Mr. Foster had purchased with funds alleged to have been stolen from Citibank. As part of the plea negotiations in this matter, Mr. Foster was asked to identify assets and properties in his control. In the course of this process, Mr. Foster notified the government of an additional property that had not been known to the government, but had been purchased in part with Citibank funds.

On September 6, 2011, a little more than 2 months after his arrest, Gary Foster executed a plea agreement with the government and entered a guilty plea to the charges contained in the above entitled information. The plea agreement provides for an adjusted offense level of 30, with a corresponding range of imprisonment of 97-121 months. In addition, as part of the agreement, Mr. Foster consented to the forfeiture of eight separate premises, the funds contained in 15 bank and /or brokerage accounts, and 6 automobiles.

Personal Background

Gary Foster was born in Kingston, Jamaica in 1975. He was the younger of two boys born to Joan Caballero and Bruce Foster. Gary never had any relationship or contact with his father, who abandoned Joan when she was pregnant with Gary.

Like many Jamaicans, Gary was raised in poverty in a small town called Colonial Ridge. Compared to many others, however, Gary's family was considered "privileged," as he, his mother, and brother, as well as cousins, lived with his grandparents, in the back of a small family owned shop. In addition to the store, the family owned a small plot of land they used for subsistence farming.

Although the town was very isolated, it had its share of violent crime and the store and Gary's family were the victims of many robberies. In his letter to the Court, attached hereto at Exhibit A, Gary recalls an incident which had a life- long impact upon him. When he was about 7 years old, the store was broken into during the night. He got out of bed and came upon three masked men and a gun. One of them pointed the gun at Gary and directed him back to bed. Gary was terrified, convinced that he was going to die, as he listened to gunfire erupt in the store. Gary, had nightmares for months following the shooting. Because of this, and other events in his life, he has always believed – not necessarily rationally - that he would not survive past 35.

In his letter to the Court, Gary describes the gunpoint robbery and also points to a number of other incidents which convinced him that he would die young. These events would shape his view of the world and his role in it.

> There were many crazy events of this nature that seeped into my life over the years and reinforced the thought of dying young. There were dreams and nightmares that haunted me and indicated an early doom....I was almost blown off a mountain by a hurricane two years after the incident mentioned above. A couple years later, I was almost washed away in a storm. When I came to the USA at twelve, I almost got kidnap

2

and two years later a taxi in Manhattan almost ran me over. These random "almost" incidents always happen to me since before birth (I was almost aborted). (sic)

Life with his grandparents was difficult, as his grandfather – his mother's stepfather - was an alcoholic who was physically and emotionally abusive towards Gary and the other children who lived with his family. He was unpredictable and volatile and didn't hesitate to inflict physical punishment on the children who lived with him. His weapon of choice was whatever was close at hand and Gary and his brother and cousins often suffered beatings with brooms, sticks, or bottles.

In spite of the poverty, Gary was always a serious student who helped the neighborhood children with their studies. Gary also helped a number of the adults in the community learn to read. From an early age, he demonstrated tremendous generosity of spirit and selflessness and was dubbed "the professor" by the townspeople. In 1980, Joan gave birth to another son, Omar Booth.

In 1985, Gary's mother left Jamaica for the United States to do what millions of immigrants had done before….to find a better life for her children. Gary and his brothers were left behind to be cared for by his grandmother. This separation from his mother was traumatic. In Jamaica, a child whose parent migrates and leaves the child in the care of a guardian while sending clothing and financial support is known as a 'barrel child.' These children, like Gary, are severely traumatized by the departure of their parents and often don't receive the emotional support from the guardian in charge. Gary was deeply affected by his mother's departure. Two years later, Gary and his brothers joined his mother in New York. This time, the separation from his grandmother – the woman who cared for him in his mother's absence - was equally painful as the earlier one from his mother.

Before Gary's arrival, Joan met and married Norman White, a man who would become Gary's father. Reunited with his mother and step-father, the family settled in Brooklyn where Gary attended public school and was a promising student. Life in Brooklyn was difficult. The family lived in a small apartment in a rat infested tenement and Gary was ridiculed because of his accent.

Over time, Joan and Norman had two more children, Alyssa, now 24 and Krystale, age 21. In 1991, the family moved to New Jersey. Gary graduated from Teaneck High School in 1993 and went on to attend Rutgers University, earning a degree in accounting in 1998.

While attending college, Gary met Joannelys Beausier. They started dating after graduation and the two married in 1998. At the time of their marriage, they were living in Hackensack, N.J. Gary was working as a temp at Citibank. Joanelys got pregnant soon after their marriage and the couple had their first child, Abrianna Foster, in August 1999. Gary became a full time Citibank employee in 2000 and the family moved to his mother- in- law's home in Union City so that she could care for Abrianna.

In 2006, Gary and Joannelys had a son, Nicholas. At the end of 2007, the strains of working many hours, took its toll on Gary's marriage. Joannelys and Gary separated and were legally divorced in 2008. Gary remains on good terms with Joannelys and is very close to both his children. He spends a great deal of time with them. He is involved in every aspect of their lives. As described in greater detail below, Gary is a "hands on" father, attending school meetings, helping with homework, and caring for his children every weekend.

Hon. Eric Vitaliano
June 22, 2012

In 2005, Gary was diagnosed with Rheumatoid Arthritis (RA), an auto-immune disease, which means that the body's immune system mistakenly attacks its own healthy organs. RA is a long term disease that leads to inflammation of the joints and surrounding tissues. It can also affect organs. Gary periodically suffers from episodes of fatigue, joint pain and stiffness, and difficulty with mobility. He is currently under the care of a specialist and on a regime of medication, including a self-administered daily injection of Humera. While the medication has been effective in treating the condition, its known side-affects include liver damage, so additional medications have to be taken to address the possible side-affects.

The Offense Conduct

By 2003, Gary was an operations specialist with managerial responsibilities at Citibank. He was in charge of three major cash accounts that served to fund other entities at Citibank. Following the events of September 11, 2011, many of the bank's accounts were in disarray. Gary was asked by supervisors to reconcile accounts - that were not his responsibility - with general ledger entries. In essence, the accounts needed to be "zeroed out;" whatever moneys flowed into the accounts had to flow out and in spite of repeated efforts, no one in the bank was able to figure out how to accomplish this accounting feat. Gary suggested that the bank write off the difference in the accounts, but this was rejected by his superiors. This discussion went on for months and months and was a constant source of stress for Gary, who was overworked and he came to learn, underpaid. Finally, Gary decided that the easiest way to get the balance in the accounts to zero was to take the money out of the accounts. Rather than transfer the funds to another Citi account or apply them for the benefit of Citi, Gary repeatedly transferred the funds to his own account over an 8 year period. He did this by generating a faxed wire transfer order identifying his personal bank account as the recipient account.

The total amount of funds taken from the bank is over $22 million. To date, the value of the funds and properties seized in connection with the forfeiture proceedings represent approximately $14 million.

There is no reasonable explanation for Mr. Foster's conduct. There is no excuse. He went down a slippery slope and became more emboldened over time by the ease with which he accomplished this theft. The only thing that can be said is that Gary Foster is beyond remorseful....he is mortified. He is mortified by the way that he compromised his integrity and violated the trust placed in him by his employers and co-workers; he is mortified by the public humiliation that his family has endured. He is horrified at the prospect of having to be separated from his family and his children. There are no excuses and none will be put forward. There is, however, a man whose total life must be defined by more than this series of events.

The Plea Agreement and the Pre-Sentence Report

As indicated above, less than two months after his arrest in this matter, Mr. Foster and the government entered into a plea agreement which provides for an adjusted offense level of 30, which carries a range of imprisonment of 97-121 months. The agreement provides for a three level reduction for acceptance of responsibility, based in part on the entry of the plea in a timely fashion, thereby saving the government the resources required to prepare for trial.

4

Hon. Eric Vitaliano
June 22, 2012

Mr. Foster was interviewed by the Department of Probation on November 1, 2012. The report was provided to counsel on April 30, 2012. The Probation Department contends that Mr. Foster is not entitled to an adjustment for acceptance of responsibility. They point to an incident in November 2011 in which Mr. Foster contacted Citibank and attempted to obtain a new debit card in order to access funds that were in his accounts, but were blocked by judicial order.

In a letter dated May 4, 2012, counsel sent a letter to the Department of Probation objecting to their position, and they have rejected our arguments. It is respectfully submitted that Gary Foster has done everything possible to accept complete and total responsibility for his actions in this matter and is deserving of a 3 point reduction in the guidelines.

Mr. Foster's contact with Citi occurred after he entered into a plea agreement with the government and voluntarily agreed to forfeit any interest in the account in question, as well as many other bank accounts, real estate and real property. He pleaded guilty months before contact was made with the bank and was well aware that the funds in the bank were "frozen" by Court order. It makes no sense that he would believe that by simply asking for a replacement debit card, he would actually have access to the funds in the account.

As indicated above, Mr. Foster was on an airplane en route to Thailand when he learned that the FBI was looking for him. Agents went to his home and informed his family that they wanted to speak with him. His family sent him a text message, which he received while awaiting take off to Thailand (he was on the ground in Paris) and provided him with the contact information for the agent. Mr. Foster telephoned the agents as soon as he was able, and was informed that an arrest warrant had been issued for him. Before contacting counsel, Mr. Foster immediately made arrangements to return to the United States and sent a copy of his airline reservations to the FBI agent. He returned to New York as quickly as he was able to do so. He was met at the airport and was completely cooperative with the agents upon being placed under arrest. In other words, he came home to "face the music."

Within weeks of Mr. Foster's return to the United States, Gary provided a thumb drive with his banking and credit card information to the government, saving the government considerable time and effort in obtaining the information by subpoena. With Mr. Foster's authorization, plea negotiations with the government were undertaken by counsel within weeks of his initial Court appearance.

As noted, the government seized a number of properties and automobiles when the criminal complaint was filed. There has never been any suggestion that this was done because of a specific concern that Mr. Foster intended to dissipate these assets. Rather, the government does this as a matter of course. In fact, Mr. Foster informed the government of the existence of an additional property that they had been previously unaware of and not seized.

It is hard to imagine a scenario in which a defendant has done more to "accept responsibility" for his actions. The prosecutor assigned to this matter, Michael Yaeger, has indicated that he will not seek any adjustment of the guidelines provided for in the plea agreement and will stand by its terms.

Sentencing

As the Court knows, the Guidelines are now advisory rather than mandatory. *United States v. Booker*, 543 U.S. 220, 244-46, 125 S.Ct. 738, 756-57 (2005); *United States v. Crosby*, 397 F.3d 103, 113

5

Hon. Eric Vitaliano
June 22, 2012

(2d Cir. 2005), *cert. denied*, 549 U.S. 915, 127 S.Ct. 260 (2006). Sentencing judges must now "consider" the Guidelines but are also required to consider all of the other factors set forth in 18 U.S.C. § 3553(a) in determining and imposing sentence. *Booker*, 543 U.S. at 245-46, 125 S.Ct. at 757; *Crosby*, 397 F.3d at 112-114. *See also Gall v. United States*, 128 S.Ct. 586, 596 (2007) ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . . The Guidelines are not the only consideration, however. . . . [T]he district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by the party").

In *Gall v. United States*, 128 S. Ct. 586, 595-97, the Supreme Court explained that while the Guidelines are a "starting point" and an "initial benchmark," courts "may not presume that the Guidelines range is reasonable" or that "extraordinary circumstances" are necessary to 'justify a sentence outside the Guidelines range." *Id.* at 595. The Guidelines are now only "one factor among several [that] courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 129 S. Ct. 1612 (2009); *Bain v. United States*, 129 S.Ct. 2157 (2009). Courts "must take an individualized assessment" of the appropriate sentence "based on the facts presented" and all of the factors detailed in 18 U.S.C. Sec. 3553(a). *Gall*, 128 S.Ct. at 590. *United States v. Johnson*, 567 F. 3d 40 (2d Cir. 2009).

"The precise weight" accorded any 18 U.S.C. § 3553(a) sentencing factor (including the Guidelines themselves) rests within the "discretion" of the sentencing court, and the Second Circuit "will not second-guess that determination in reviewing an otherwise reasonable sentence." *United States v. Marshall*, 186 Fed. Appx. 125, 128 (2d Cir. 2006) (citing *United States v. Florez*, 447 F.3d 145, 157-58 (2d Cir.), *cert. denied*, 549 U.S. 1040, 127 S.Ct. 600 (2006)). *See also Gall*, 128 S.Ct. at 597 (appellate courts "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify" a non-Guidelines sentence); *United States v. Adelson*, Nos. 06-2738-cr (L), 06-3179 (XAP), 2008 WL 5155341, at *1 (2d Cir. Dec. 9, 2008) (affirming a wide variance from the Guidelines because the district court's "decision to impose a below Guidelines sentence was not a failure or refusal to recognize the Guidelines, but rather a carefully considered reliance on the Section 3553(a) factors"). Significantly, sentencing judges are authorized to consider their "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

In instructing on the practical application of *Booker*, the Second Circuit directed that sentencing courts should: (1) determine the applicable advisory Guidelines range; and then (2) determine, based on all the factors set forth in 18 U.S.C. § 3553(a), whether to impose a Guidelines sentence or a non-Guidelines sentence. *See Gall*, 128 S.Ct. at 596-97; *Crosby*, 397 F.3d at 113. Indeed, if this Court "conclude[s] that two sentences equally serve the statutory purposes of § 3553, it [cannot] not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

While Gary Foster's conduct and crime are inexplicable and inexcusable, we ask the Court to look beyond the criminal act and take note of the who Gary Foster, the man, is. He is a father, a son, a brother, nephew and friend. Attached at Exhibit B are letters from Gary's loved ones, who know him as a kind, generous, gentle man, who is much beloved.

Joan White, Gary's mother, is 64 years old and lives in N.J. She describes Gary as an ideal son, who never gave her reason to worry about him. Unfortunately, now she has plenty of reason to worry and she is deeply concerned about his fate and completely at a loss to explain his conduct. She knows

6

Hon. Eric Vitaliano
June 22, 2012

how close he is to his children and what a devastating affect a prolonged separation will have on them. She also sees how remorseful and embarrassed Gary is and how his conduct has affected the entire family.

> Gary was always a helpful child. I never had a problem with him, never got a complaint from school, always into his school work, I never had to worry about my son falling into the many peer pressures many school children are faced with. At home he would do household chores, even taking initiative many of times. He also took care of his younger siblings, making sure their homework was completed as well as his own before I got home from work.

> It breaks my heart whenever Gary would leave Nicholas, he would always cry. With this ordeal he is in, I really do not know what is going to happen if Gary was to be separated from them because they really love their father and he adores his children.

> I know and understand you have a job to do, but I am hoping and praying that having Gary serve time in prison is not what you find to be most just. As a mother especially, but more so for his kids, I ask of you judge to please have mercy on my son. I am now helping with his children by having them over every weekend. He has expressed to me how depressed he was because he dragged his whole family into this mess….He is very embarrassed and very sad.

> I am begging you Judge Vitaliano to take into consideration all of which I have shared with you. He cooperated well and turned himself into authorities without a fight. I still love him and no matter what the consequences are I will be there for him like always.

Although Norman White is Gary's step-father, he considers himself Gary's real father…..as does Gary. Norman has been in Gary's life since he was a little boy and loves him like his own son. Norman recognizes that your honor may view his comments as being "biased," but is hopeful that he can provide the Court with a more complete picture of Gary.

> I came into Gary's life when he was only five years old and has been there ever since. Therefore, although not biological, Gary is my son. Even as a child Gary has fashioned himself to be a self-sufficient individual, a trait that's has led him to be the loving, caring, unselfish and unpretentious man he has grown up to be.

> Gary joined his mother and myself in America with the opportunity to have the chance of the American Dream. Gary was an honor student all the way through junior high school, high school and college…where he graduated with his Bachelor's degree…..After college, Gary started his career at Citi Group and steadily progressed to being a Vice President. As a father, I was proud as could be.

Norman notes that the public nature of this matter has not only been embarrassing, but extremely stressful for his family. He also assures the Court that "Gary is sincerely remorseful and apologetic for his actions." Norman hopes that Gary will not be taken from the family for a long time.

7

Gary always wants to be a positive influence on everyone around him. He has two children who adore him world without end who have been dealing with the divorce of their parents for the past few years. Any additional separation time will be very devastating to especially the older child as she is of age to understand the ramification of her father's action. She cries incessantly.

Abrianna, Gary's twelve year old daughter, has also written to the Court. In her letter, Abrianna says that her father treats her and her brother with "love, care and respect." Her father told her that he was an A+ plus student when he was younger and "I try to follow in his footsteps and get a good job like he did." Abrianna's request to the Court is simple: "so please, all I ask you, all we ask you is don't take him away."

After Gary and Joannelys were divorced, they remained on good terms and have shared the responsibilities of raising their children. Joannelys has been very supportive of Gary since his arrest and has tried to prepare her children for the worst. The fact that she continues to think highly of him is a great testament to their relationship and a rarity among divorced spouses. Joannelys acknowledged that even after their divorce, Gary has been "very supportive to his children and me." Joannelys' letter describes Gary as a hard working individual; dedicated to his work and family, and "one of the kindest individuals" she has ever met. Joannelys asks that the Court take into consideration Gary's "great qualities" and that he has two children who "really need him."

Gary is also beloved by his siblings. In their letters to the Court, they describe their relationship with their brother and how much he means to their lives. Omar Booth, Gary's younger brother, has enormous respect and affection for Gary. Omar and his wife had their first child in early July 2011, when the news of Gary's arrest first came to light. In the midst of this terrible event that the family was enduring, Brynn's birth was a bright light and there was no one happier about her birth than Gary, who was asked to be Brynn's godfather. "When you break down the definition of a godparent to the core, Gary defined those qualities on a consistent basis with his actions which made him an easy choice." Omar speaks of Gary's relationship with his own children and how that relationship has shaped each child:

> Gary Foster, the father, has two beautiful children, Abrianna, who is 12 years old and Nick, who is 5 years old. Gary is the only person that commands the full respect, attention and love of Abrianna. He uses this devotion to ensure that she performs well in school, is respectful to those around her, and is involved in such activities as drama, dance and the library club which adds value to herself and those around her. The relationship that Gary has with Nick exemplifies the reason why a boy needs his dad. When Nick stays with his dad, there is a positive impact on Nick's actions which are apparent to his professor and his relatives. There is a noticeable increase in Nick's participation in class and level of satisfaction with all activities both at home and in school. Abrianna and Nick need their father Gary in their life to help them reach their full potential and to avoid any deficiency due to the absence of their father who has always been present, active and involved in their lives.

Krystal White, Gary's youngest sister, is 16 years his junior. She has always had a special relationship with Gary and pleads for mercy for her brother. In her letter to the Court, she speaks of Gary's selflessness. "How many people can you say that you know that actually puts everybody they

8

love before themselves, concerns themselves with everybody else's happiness before they worry about their own bliss? I can say I know one for a fact, and that is my brother Gar."

Alyssa White, Gary's other sister, has also submitted a letter to the Court. She describes an older brother who has always been loving and supportive. She too pleads for mercy for her brother: "I am asking you Judge to please look at this young man as a gift from god to our family....He has two children who love him more than ever and he is so proud of them because they are both very intelligent kids....Taking him away from us too long will definitely cause depression and heartache."

In addition to the letters cited above, we have also attached a number of other letters from Gary's family and friends. These are found at Exhibit C. The common theme contained in all of these letters is Gary's kindness, generosity and dedication to his children. We urge the Court to read all of the letters. They portray a fuller picture of who Gary Foster is, of what kind of man he is, and who the people who love and support him are. These are all important factors for the Court's consideration.

As indicated above, Mr. Foster has written to the Court in a letter attached at Exhibit A. In his letter, he attempts to provide some explanation for his conduct. He offers no excuses and takes full responsibility for his conduct. He recognizes the enormous destruction he has caused himself and his family. He recognizes how he betrayed the trust of his co-workers.

> ...with these funds I could live the life I always wanted now. I don't have to wait or struggle to reach my goals. So I jumped at the opportunity to do so and with denial as my weapon I used this horrible scheme to fund the episodes of my life that made me a false hero at work and in my private life. (sic)

Gary recounts how he was "relieved" when he found out that the FBI was looking for him, because now the masquerade was over:

> The texts gave me a sense of freedom. My secret had finally been revealed. It made me feel happiness again and for once I was not burden with denial and hiding and feeling I am living a lie. Regret soon followed. I was doing well at work when I quit...Also, the media attention to this case made for a public humiliation of my family and friends and the many who had loved and supported me. My God! My children had reed the news on the Internet! (sic)

> Life was never supposed to be like this...this is not what the poor kid from Jamaica had envisioned for himself...not for the guy to who go to inner city kids and try to show them there is a power I growing up poor that could get you extremely far in this life and extremely successful...

Ultimately, Gary will have to live with the fact he is a disappointment and embarrassment to his family. He is very fortunate to have the continued love and support of his family.

> My mother who was always proud of me and love telling the story – to anyone who would listen – how my dad left her when she was pregnant with me and she was contemplating an abortion but did not go through with it because she felt that this was going to be the child that makes her the most proud, love to tell everyone how good I

Hon. Eric Vitaliano
June 22, 2012

was doing. She was very happy because she was the only one of her nine siblings that did not get a chance to go to college and to have the most successful child made her beam with joy and gave her a sense of accomplishment. I now cannot stare her in the eyes, As one of my hero, I felt I had let her down – I had become the problem child. (sic)

Whatever prison sentence your honor imposes will have an enormous impact on Gary's life and the lives of his entire family. However, it will be his children who will suffer the most. By all accounts, they are very close, and he is devoted to them.

We respectfully request that the Court impose a just and fair sentence...one that is tempered with compassion and mercy. A lengthy sentence in this case is not required to protect society from Gary Foster. The imposition of any prison term will be more than adequate to address the factors enunciated in 18 USC 3553(a) and will serve to adequately punish Gary for his conduct.

Thank you for your attention to this matter.

Very truly yours,

ISABELLE A. KIRSHNER      BRIAN D. LINDER

cc: Michael Yaeger, Esq.
    Karen Hennigan, Esq.